## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-CR-379-7 (ABJ)** |
| | : | |
| **LARRY DUNCAN,** | : | |
| also known as "Larry Love," | : | |
| also known as "Love," | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' RESPONSE IN OPPOSITION
### TO DEFENDANTS' MOTION TO SUPPRESS

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and undersigned counsel, respectfully files this Response in Opposition to Defendant Larry DUNCAN's "Motion to Suppress Evidence Seized on September 18, 2025" (Docket Entry 199) (hereinafter "Def. Motion"). The bases for this opposition follow.

### PROCEDURAL POSTURE AND RELEVANT FACTS

On September 10, 2025, a federal grand jury returned a Second Superseding Indictment, which added DUNCAN as a Defendant and charged him with: Conspiracy to Distribute and Possess With Intent to Distribute More Than 100 Kilograms of Marijuana and a Detectable Amount of Oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii), 841(b)(1)(C), and 846 (Count One); Conspiracy to Discharge, Brandish, Use, Carry, and Possess Firearms, Including Machineguns, During, in Relation to, and in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(o) (Count Two); Unlawful Distribution and Possession With Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 18 U.S.C. § 2 (Counts Ten, Twelve, and Fifteen); Using, Carrying, and Possessing a Firearm During, in Relation to, and in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i),

and 2 (Counts Eleven and Sixteen); and Discharging, Brandishing, Using, and Carrying a Firearm During and in Relation to a Drug Trafficking Offense, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), and 2 (Count Thirteen).  Along with the return of the Indictment, a warrant was issued for DUNCAN's arrest.

On September 16, 2025, United States Magistrate Judge Ajmel A. Quereshi of the United States District Court for the District of Maryland, Southern Division, signed Search Warrants 8:25-mj-02372 and 8:25-mj-02373 (collectively, "the Search Warrants"), which authorized the searches of "THE RESIDENCE LCOATED AT 400 CEDAR RIDGE DRIVE, OXON HILL, MARYLAND 20745" and "A JEEP WRANGLER BEARING VIRGINIA TAG TDD4337 and VIN # 1C4BJWDGXGL269566," respectively.

On September 18, 2025, FBI agents executed the Search Warrants and the arrest warrant at 400 Cedar Ridge Drive, Oxon Hill, Maryland, 20745 (hereinafter "400 Cedar Ridge"). DUNCAN was taken into custody and, during a search of DUNCAN's bedroom, agents recovered more than 30 pounds of marijuana, $72,000 in United States currency, and a Glock 17 pistol fitted with an extended magazine and a switch-style Machinegun Conversion Device ("MCD"), commonly referred to in street slang as a "giggle switch."

On November 14, 2025, DUNCAN filed the instant Motion to suppress the evidence seized pursuant to the Search Warrants. Def. Motion, at 1-9.  This opposition follows.

## ARGUMENT

## I.    THE SEARCH WARRANTS WERE SUPPORTED BY FRESH PROBABLE CAUSE, WERE PARTICULAR AND NOT OVERBROAD, AND ESTABLISHED A NEXUS TO SEARCHING THE IDENTIFIED LOCATIONS FOR THE IDENTIFIED EVIDENCE

The "'task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability

that . . . evidence of a crime will be found in a particular place.'" United States v. Manafort, 314 F. Supp. 3d 258, 266 (D.D.C. 2018) (quoting Illinois v. Gates, 462 U.S. 213, 239 (1983)); see also United States v. Ali, 870 F. Supp. 2d 10, 25 (D.D.C. 2012); United States v. McCormick, 2019 WL 3718944, at *2 (D.D.C. Aug. 7, 2019). On review, the magistrate's probable cause determination is entitled to "great deference." United States v. Spencer, 530 F.3d 1003, 1006 (D.C. Cir. 2008) (citing Gates, 462 U.S. at 236).

The Supreme Court has long held that such deference encourages officers to seek a warrant prior to executing a search. United States v Ventresca, 380 U.S. 102, 105-06 (1965) (noting that "the deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried actions of officers.")  As the D.C. Circuit has held, "[e]ven if we disagree with the judge's probable-cause determination after giving it 'great deference,' that disagreement alone does not justify exclusion of evidence. That is because the "exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.'" Spencer, 530 F.3d at 1006 (quoting Massachusetts v. Sheppard, 468 U.S. 981, 990, (1984)). Thus, the duty of a reviewing court "'is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" United States v. Ali, 870 F. Supp. 2d 10, 25 (D.D.C. 2012) (quoting Gates, 462 U.S. at 238-39).

### A.    The Search Warrants Were Supported by "Fresh" Probable Cause

DUNCAN argues that the Search Warrants were not supported by probable cause because the information contained in the affidavit was stale. Def. Motion, at 4-6.  This argument is without merit.

The Fourth Amendment requires that search warrants be supported by probable cause and state with particularity the places that will be searched and the things that will be seized. U.S.

CONST. Amend. IV. "The law is clear that an affidavit in support of a warrant application 'must provide the magistrate with a substantial basis for determining the existence of probable cause,' and it cannot consist of 'wholly conclusory statement[s].'" Manafort, 314 F. Supp. 3d at 266 (quoting Gates, 462 U.S. at 239). "The proponent of a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure." Id. at 263 (citing Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978)).

"'In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 231 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). As Gates reiterated, "'[t]he process does not deal with hard certainties, but with probabilities. . . [or] common-sense conclusions about human behavior[.]'" Id. (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

"As a general matter, the likelihood that incriminating evidence continues to exist in the place to be searched—taking into account 'the opportunities those involved in the crime would have had to remove or destroy [incriminating] items'—is an important consideration when assessing the existence of probable cause." United States v. Griffith, 867 F.3d 1265, 1275 (D.C. Cir. 2017) (citing 2 Wayne R. LaFave, SEARCH & SEIZURE § 3.7(a) (5th ed. 2016)). "Because probable cause must exist at the time that law enforcement applies for a warrant, the freshness of the supporting evidence is critical." United States v. Washington, 775 F.3d 405, 408 (D.C. Cir. 2014) (citing Schoeneman v. United States, 317 F.2d 173, 178 (D.C.Cir.1963)). "In the typical case where the police seek permission to search a house for an item they believe is already located there, the magistrate's determination that there is probable cause for the search amounts to a prediction that the item will still be there when the warrant is executed." United States v. Grubbs,

4

547 U.S. 90, 95, (2006) (citing People v. Glen, 30 N.Y.2d 252, 258, (1972) ("[P]resent possession is only probative of the likelihood of future possession")).

"[S]earches for evidence of a drug trafficking conspiracy may be based on older information given the continuing nature of that crime and the fact that drug dealers may store inventory and records at their homes for some time." United States v. Savoy, 889 F. Supp. 2d 78, 98 (D.D.C. 2012) (noting that evidence connected the Defendant to the ongoing conspiracy "within 174 or 119 days of the warrant, respectively" was not stale) (citing United States v. Hopkins, 128 F. Supp. 2d 1, 7 (D.D.C. 2000)).  The D.C. Circuit has also noted that officers may reasonably assume that drug dealers will maintain records related to their drug dealing for extended periods of time.

> "[I]t would not necessarily have been unreasonable for an officer to conclude that a longtime drug dealer, whose most recent known deal had occurred three months earlier, would still retain papers permitting him to get back in touch with his customers or—as turned out to be the case—his supplier." As records might well be retained even during a lull in sales, there was considerable prospect that such records would still be available in the defendant's dwelling even 109 days after his most recent known sale.

United States v. Johnson, 437 F.3d 69, 72 (D.C. Cir. 2006) (quoting United States v. Webb, 255 F.3d 890, 905 (D.C. Cir. 2001)).

The Probable Cause section of the search warrant affidavit began by tying DUNCAN to both the residence and the vehicle that were the subject of the Search Warrants.  Affidavit, 8:25-mj-02372 and 8:25-mj-02373, ¶¶ 10-16 (Attachment One).  The affidavit noted that DUNCAN was one of the registered owners of the vehicle, that the vehicle had been parked in front of the residence, and that DUNCAN had been seen driving the vehicle. Id. ¶¶ 10-11.  The affidavit then identified that the residence was listed as DUNCAN's current address on two credit report databases. Id. ¶¶ 12-13.  Next, the affidavit stated that DUNCAN was seen driving the vehicle to

the Oak Hill Apartments – located in the 3300 block of Wheeler Road, Southeast – on June 27, 2024. Id. ¶ 14.   The affidavit also noted that a geolocation warrant had been issued for DUNCAN's cellular telephone, and that geolocation information from that telephone showed that DUNCAN was inside the residence while surveilling agents saw the vehicle parked in front of the residence. Id. ¶¶ 15-16.

The affidavit next outlined FBI's search of 3700 9th Street, Southeast, Apartment 1018, Washington, D.C. (hereinafter, "Apartment 1018") which was being utilized as a "trap house" for the distribution of marijuana and oxycodone. Id. ¶ 17. The affidavit noted that the search warrant, which was executed on September 14, 2023, resulted in the seizure of marijuana, firearms, ammunition, and cellular telephones and further noted that Markquette Cowan was arrested during the execution of the search warrant and that Cowan's cellular telephone was among those seized. Id. ¶ 18. Cowan's telephone was searched pursuant to a search warrant, revealing numerous conversations with DUNCAN – including conversations about the fact that DUNCAN had listed Apartment 1018 as his residence on government forms. Id. ¶¶ 18, 18(a), 19, 20.  The affidavit then described the circumstances of DUNCAN's conviction for Carrying a Pistol Without a License and Unlawul Possession of a Large-Capacity Feeding Device in D.C. Superior Court Case Number 2019 CF2 012583. Id. ¶¶ 21, 21(a), 21(b), 21(c).

The affidavit then summarized evidence in support of Special Agent Rothman's suspicion that Cowan was operating Apartment 1018 as a "trap house" on DUNCAN's behalf, and that DUNCAN was the source of supply for marijuana to that trap house. Id.  ¶ 22. This evidence included a description of digital messages between DUNCAN and Cowan discussing marijuana in March and May 2023. Id. ¶¶ 23-25.  The evidence also included a description of digital messages

during which DUNCAN and Cowan discussed the payment of rent and other expenses related to Apartment 1018. Id. ¶ 26.

Next, the affidavit discussed the monitoring of DUNCAN's Instagram account – which utilized the vanity name "larrylove_men_of_business" – and his use of that account to demonstrate ongoing support for the PDS street crew and its members and activities. Id. ¶ 27. For example, in November 2023, after Cowan and other co-conspirators had been arrested and detained, DUNCAN posted on Instagram denouncing the cooperation with law enforcement by people he referred to as "rats." Id. ¶ 28. DUNCAN also indicated his apparent support for a post made on Cowan's behalf in December 2023. Id. ¶¶ 29-30. Also in December 2023, DUNCAN posted that "either u wit me or against me" regardless of "mutual family," apparently seeking to discourage COWAN and others from cooperating with law enforcement against DUNCAN. Id. ¶ 31. DUNCAN then made two posts expressing his desire to "free" PDS members that had been arrested, whom he identified by street nickname in one of the posts. Id. ¶¶ 32-33. DUNCAN then posted that if he put his "hitta" on someone, that person would be killed immediately. Id. ¶ 34. On February 4, 2024, DUNCAN posted a picture of himself with a large stack of what appeared to be $100 bills. Id. ¶ 35. On February 11, 2024, DUNCAN posted a video to his Instagram story with the caption "when your 'homie' get flipped by the feds" – yet another reference to cooperation with law enforcement. Id. ¶ 36.

The affidavit then described FBI's surveillance of DUNCAN in April and May 2024, which surveillance was assisted by the collection of geolocation information from DUNCAN's cellular telephone pursuant to Search Warrants 24-SC-757 and 24-SC-1057. Id. ¶¶ 37-42. The surveillance showed that DUNCAN travelled from 400 Cedar Ridge to the Renaissance Homes Apartments – formerly known as the Oak Hill Apartments – almost daily while he was under

surveillance. Id. ¶ 37. Specifically, DUNCAN travelled to 3320 Wheeler Road, Southeast, Apartment 203 (hereinafter, "Apartment 203"), where he was visited by numerous individuals who stayed a short period of time before leaving carrying bags in a manner that is consistent with drug distribution. Id. ¶¶ 37-42. PDS members have long maintained "trap houses" at various locations within the Renaissance Homes/Oak Hill complex. Id. ¶ 47.

The affidavit then described that a vehicle driven by Dayontae Duncan, DUNCAN's brother, was stopped by United States Park Police on February 5, 2025. Id. ¶ 43-44. During the stop, Duncan and his passenger, Darren Daniels, were stepped out of the vehicle. Officers observed a bulge in Daniels' waistband and, during a protective pat-down, discovered a black in color digital scale with .56 grams of a white substance. Id. ¶ 44. Subsequent to the pat-down, officers observed a white substance between the floorboard and passenger seat consistent with the substance seized from Daniels. Id. During the ensuing automobile search, Officers recovered a substantial amount of marijuana, an additional digital scale, and packaging material in the vehicle. Id. ¶¶ 45-46. Duncan was placed under arrest, and $2,910 was seized from him during a search incident to arrest. Id. ¶ 46.

During the traffic stop, DUNCAN arrived on scene, identified himself as Duncan's cousin, and was permitted to take custody of Duncan's cellular telephone. Id. ¶ 47. While speaking with the officers, DUNCAN stated that he resided at Apartment 203. Id. Special Agent Thomas later provided information that CCTV footage at Renaissance Homes/Oak Hill showed DUNCAN, Duncan, and Daniels together inside Apartment 203 on February 5, 2025 – the same day as the traffic stop. This footage showed that the men leaving Apartment 203 carrying the bags from which marijuana was discovered and seized during the search of Duncan's vehicle. Id. ¶ 49.

As noted in the affidavit, law enforcement applied for and obtained search warrant 25-SW-36, which authorized the search of the cellular telephone seized from Daniels during the traffic stop and resulting search and arrest. Id. ¶ 50. The search of that cellular telephone showed a conversation that occurred on January 31, 2025, at approximately 8:34pm EST,[1] during which DUNCAN instructed Daniels to package two half-ounce bags of marijuana for a customer that was sitting outside. Id. ¶ 51. The affidavit then noted that DUNCAN, Duncan, and Daniels were all evicted from Apartment 203 on February 5, 2025, the same day as the traffic stop. Id. ¶ 52.

Finally, the affidavit noted that Special Agent Rothman continued to monitor DUNCAN's Instagram account after February 5, 2025, and noted numerous instances where DUNCAN used that account to reaffirm his allegiance to PDS, its members, and its activities. Id. ¶ 53. On July 15, 2025, DUNCAN posted that "rats" have "no place in this community" and should "go eat needles and swallow acid" – yet another admonition discouraging individuals from cooperating with law enforcement. Id. ¶ 54. This post was made after two PDS members entered into cooperation plea agreements and testified at trial against fellow PDS members. Id. On July 22, 2025, DUNCAN posted "PDS4L" ("PDS for life") – reaffirming his allegiance to the gang. Id. ¶ 55.  In that same post, DUNCAN proclaimed that anyone who wasn't "with this shit" is "against it," indicating that anyone who was not part of the gang was an enemy of the gang. Id.  On August 25, 2025, DUNCAN posted a picture to his Instagram story during which he reaffirmed his allegiance to Andre Alonte Willis – who utilized an Instagram account with the vanity name "man.of.faith."[2] Specifically, this post discussed the ways in which DUNCAN and Willis sold marijuana together.

---

[1] The UTC time stamp for the conversation begins at 12:34am on February 1, 2025.

[2] Willis changed his vanity name following his arrest – prior to his arrest the vanity name was "man.of.business".

Id. ¶ 56. Willis was one of the PDS members who was convicted at trial following the testimony of two cooperating PDS members. Id. ¶¶ 56-57. Finally, the affidavit noted that DUNCAN had previously posted a picture of himself with Willis and Eugene Tracy Hill on the same day that Willis was convicted at trial, stating "I love the shit out my brothers we all got three mothers" and "it's me losing dae dae and lito all over again" – an apparent reference to previous instances where PDS members close to DUNCAN were convicted and imprisoned. Id. ¶ 57.

DUNCAN is correct, in that the affidavit does include information dating back to 2022 in its recitation of probable cause. That evidence is necessary, however, to give context for the evidence provided from 2024 and 2025 which demonstrates DUNCAN's ongoing distribution of marijuana as well as his ongoing allegiance to the PDS street crew which, as articulated in the affidavit, made money by selling marijuana from "trap houses" – residences that were maintained for just that purpose. The affidavit shows that DUNCAN stopped selling marijuana from the trap house at Apartment 1018 after the FBI search warrant at that location and returned to Renaissance Homes/Oak Hill and where he sold marijuana from the trap house at Apartment 203. The affidavit also shows that, although he was evicted from Apartment 203, DUNCAN's membership in and allegiance to PDS remained steadfast. In other words, the affidavit shows that – over the course of more than two years – DUNCAN changed the location of his actions, but the actions themselves did not change.

DUNCAN's posts in July and August 2025 were clearly not stale in relation to the September 2025 search warrant, and they showed that the more historical evidence demonstrated a pattern of conduct that continued into the present day. See, e.g., Johnson, 437 F.3d at 72; Savoy, 889 F. Supp. 2d at 98. Consequently, the evidence outlined in the affidavit was sufficient to

establish probable cause to believe that DUNCAN continued to be engaged in the distribution of marijuana and that evidence of that offense would be discovered in his residence and automobile.

**B.    The Search Warrants Establish a Nexus Between the 400 Cedar Ridge and the Ongoing Drug Dealing Conspiracy**

DUNCAN next argues that the Search Warrants fail to establish any nexus between the ongoing drug distribution conspiracy and 400 Cedar Ridge.  Def. Motion, at 6-7.  This argument is without merit.

Adopting the reasoning of its sister circuits, the D.C. Circuit has held that "observations of illegal activity outside of the home can provide probable cause for the issuance of a search warrant for a suspect's house, even in the absence of an allegation that any illegal activity occurred in the home itself."  United States v. Thomas, 989 F.2d 1252, 1254-55 (D.C. Cir. 1993) (citations omitted) (emphasis added); see also United States v. Dixon, 787 F.3d 55, 60 (1st Cir. 2015) (holding that a search warrant affidavit was sufficient, even though it "contained no observations of [defendant] engaging in other activities deemed to be drug related in or in the vicinity of" his apartment[,]" because probable cause "requires only a 'fair probability'—not certainty—that evidence of a crime will be found in a particular location.")

The D.C. Circuit expanded on this opinion, noting that such observations provide probable cause to search a drug dealer's home "if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence." Spencer, 530 F.3d at 1007 (citing United States v. Johnson, 437 F.3d 69, 71-72 (D.C. Cir. 2006); Thomas, 989 F.2d at 1255).  As the Spencer Court noted:

> Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade—such as drugs, drug paraphernalia, weapons, written records, and cash—in secure locations. For the vast majority of drug dealers, the most convenient location to

secure items is the home. After all, drug dealers don't tend to work out of office buildings. And no training is required to reach this commonsense conclusion

Id.

The affidavit specifically included Special Agent Rothman's assertions, based on his training and experience, that drug dealers typically keep "evidence, contraband, fruits, and instrumentalities" of narcotics distribution in their residences and vehicles. Attachment One, at ¶ 59. Special Agent Rothman further noted that drug dealers often kept "documentary evidence" of their crimes inside their residences "for months, if not years", and that evidence of the relationship between co-conspirators is often retained in residences or on cellular telephones. Id. ¶ 60, 62.   Special Agent Rothman also noted that the fruits of drug dealing – in the form of "currency. . . jewelry, casino chips, cryptocurrency" among other forms – was often stored inside a drug dealer's residence. Id. ¶ 61.

Separate and apart from Special Agent Rothman's training and experience, however, the probable cause section supports the belief that DUNCAN would be storing and/or selling his marijuana inside a residence:

1.    The evidence showed that DUNCAN was supplying marijuana for sale out of Apartment 1018, through Cowan, until the FBI searched the property. Id. ¶¶ 17-18, 22-26. DUNCAN also claimed Apartment 1018 as his residence on at least one government form.  Id. ¶ 18(a).

2.    The evidence also showed that DUNCAN utilized Apartment 203 for the sale of marijuana. Id. ¶¶ 37-42, 49-52. DUNCAN also claimed Apartment 203 as his residence during an interaction with law enforcement officers. Id. ¶ 47.

3.    The evidence showed that DUNCAN traveled from 400 Cedar Ridge to Apartment 203 almost every day that he was under surveillance. Id. ¶ 37.

12

4.      The evidence showed that, even after being evicted from Apartment 203, DUNCAN used his Instagram account to reaffirm his commitment to the PDS street crew and its activities – including the sale of marijuana.  Id. ¶¶ 53-56.

5.      The affidavit also provided sufficient evidence to find that DUNCAN was residing at 400 Cedar Ridge at the time that those Instagram posts were made. Id. ¶¶ 10-16.

In totality, then, the affidavit plainly illustrated that DUNCAN utilized apartments where he claimed residence to sell marijuana and traveled to and from 400 Cedar Ridge for that purpose, Id. ¶¶ 17-18(a), 22-26, 37-42, 47, 49-52, and further articulated that, in Special Agent Rothman's training and experience, drug dealers frequently keep evidence of their crimes inside their residences. Id. ¶¶ 59-62. Given this background and considering that DUNCAN was utilizing 400 Cedar Ridge as a residence when he reaffirmed his allegiance to PDS in the weeks prior to the Search Warrants' issuance, the affidavit provided a sufficient nexus for the magistrate to believe that 400 Cedar Ridge would contain evidence, instrumentalities, and fruits of his marijuana distribution business.

## C.      The Search Warrants Were Particular and Were Not Overbroad

DUNCAN argues that the Search Warrants were "facially overbroad" and lacked particularity. Def. Motion, at 7-8.  This argument is without merit.

Even if a search warrant is supported by probable cause, it will not pass Constitutional muster if it does not describe, with particularity, the location of the search and the things to be searched for and seized. Groh v. Ramirez, 540 U.S. 551, 557-65 (2004).  The particularity requirement not only prevents against general searches, but also ensures the person being searched that the officer is possessed of lawful authority to conduct the search. See, e.g., Maryland v.

Garrison, 480 U.S. 79, 84 (1987); Marron v. United States, 275 U.S. 192, 196 (1927). "'Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.'" Manafort, 314 F. Supp. 3d at 263-64 (quoting United States v. Hill, 459 F.3d 966, 973 (9th Cir. 2006); United States v. Towne, 997 F.2d 537, 544 (9th Cir. 1993)).

Notwithstanding the particularity requirement, warrants authorizing the search of electronic data are not "overbroad" simply because they allow law enforcement to search the entirety of that data for evidence of a specified criminal offense.  See United States v. Williams, 592 F.3d 511, 521-23 (4th Cir. 2010) (noting that "the sheer amount of information contained on a computer does not distinguish the authorized search of the computer from an analogous search of a file cabinet containing a large number of documents"); see also United States v. Skinner, 2021 WL 1725543, at **15-16 (E.D. Va. 2021); United States v. Karrer, 260 Fed. App'x 157, 161 (3d Cir. 2012) (citations omitted). Moreover, when executing such a warrant, law enforcement is entitled to seize evidence of non-specified criminal activity that is observed in "plain view" while searching for evidence of specified criminal activity. Williams, 592 F.3d at 521-23 (citing Horton v. California; 496 U.S. 128, 136 (1990); Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976)); Karrer, 260 Fed. App'x. at 163-64 (citing Horton, 496 U.S. at 141; United States v. Stabile, 633 F.3d 219, 240-42 (3d Cir. 2011); United States v. Menon, 24 F.3d 550, 559 (3d Cir. 1994)).

DUNCAN argues that the warrant lacks specificity because it authorizes the seizure of "any and all" evidence – namely "all records, all financial documents, all photographs", etc. Def. Motion, at 7-8.  However, Attachment B to the Search Warrants plainly articulates that, for each subset of items to be seized, seizure is only proper if the items themselves are related to the

14

"TARGET OFFENSES," which were identified as conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and using, carrying, or possessing a firearm during, in relation to, and in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c). Here, the warrant did not authorize a "'wide-ranging exploratory search[ ]'" of the type that "'the Framers intended to prohibit.'" Manafort, 314 F. Supp. 3d at 263 (quoting Garrison, 480 U.S. at 84). Rather, the warrant authorized the agents to search the premises for evidence of specific crimes articulated in the warrant itself.

## II.    EVEN IF THE SEARCH WARRANTS WERE FLAWED, THE AGENTS WERE ENTITLED TO RELY ON THEM IN GOOD FAITH

Even if the Court were to find that the evidence supporting the Search Warrants was stale, that the warrant failed to establish a nexus to DUNCAN's apartment, or that the Search Warrants were overbroad, the agents would still be entitled to rely in good faith on the magistrate's issuance of the Search Warrants.

It is well established that law enforcement is entitled to rely on a magistrate's probable cause determination. United States v. Leon, 468 U.S. 897, 921 (1984); see also United States v. Maxwell, 920 F.2d 1028, 1034 (D.C. Cir. 1990). As such, "[s]o long as the officer relied in objective good faith on the issuing judge's determination, reviewing courts may not apply the exclusionary rule." Spencer, 530 F.3d at 1006-07. The Spencer Court noted that "the 'degree of police deference to the magistrate which is perceived by courts as reasonable under Leon exceeds significantly that 'great deference' owed the magistrate by reviewing courts under Gates.'" Id. at 1007 (quoting 1 Wayne R. Lafave, SEARCH AND SEIZURE § 1.3(f), at 97–98 (4th ed.2004) (footnote omitted). In short, police officers are "entitled to presume that the magistrate knows what he is doing." Id.

In cases where law enforcement relies on a warrant that is later determined to lack probable cause, the reviewing court must balance the deterrent value of excluding evidence against the fact that such exclusion unacceptably impedes the Court's truth-finding functions. Leon, 468 U.S. at 907; United States v. Payner, 447 U.S. 727, 734 (1980); Stone v. Powell, 428 U.S. 465, 490 (1976). As Judge Huvelle noted in Ali:

> When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and "exclusion cannot pay its way."

870 F. Supp. 2d at 24 (citing Davis v. United States, 564 U.S. 229, 237-40 (2011); Herring v. United States, 555 U.S. 135, 144 (2009), and quoting Leon, 468 U.S. at 908 n. 6.). Consequently, the reviewing court must determine the objective reasonableness of the officers' reliance by considering "'whether a reasonably well-trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Id. (quoting Herring, 555 U.S. at 145; Leon, 468 U.S. at 922 n.23). As this Court has recognized, "[t]his good faith exception to the exclusionary rule applies not only when a reviewing court concludes that the affidavit in support of the warrant lacked probable cause, but also to warrant is later found to be overbroad." Manafort, 313 F. Supp. 3d at 236.

Here, Special Agent Rothman presented a detailed affidavit to Magistrate Judge Quereshi and requested permission to search DUNCAN's apartment and vehicle. The evidence presented in the affidavit outlined the ongoing drug dealing conspiracy as well as DUNCAN's conduct in the months leading up to the application for a search warrant. There was no evidence withheld from the magistrate, nor does DUNCAN suggest as much, and the affidavit did not rely on evidence that Special Agent Rothman knew or believed to be untrustworthy. The requested search

warrants were granted based upon the affidavit, and Special Agent Rothman was entitled to rely on Magistrate Quereshi's finding that the Search Warrants were supported by probable cause, established a proper nexus to DUNCAN's apartment, and were not overbroad. In other words, Special Agent Rothman was entitled to assume that Magistrate Judge Quereshi knew what he was doing. Spencer, 530 F.3d at 1007.

III.    **DUNCAN's MOTION MERELY CHALLENGES THE LEGAL SUFFICIENCY OF THE SEARCH WARRANTS AND DOES JUSTIFY AN EVIDENTIARY HEARING**

DUNCAN's arguments are limited to the legal sufficiency of the Search Warrants and, as such, he has not established any basis to hold an evidentiary hearing. Courts in this Circuit have clearly articulated that "it is a 'normal process' for a court to review the legal sufficiency of an affidavit to support probable cause without an evidentiary hearing." United States v. Bikundi, 125 F. Supp. 3d 178, 190 (D.D.C. 2015) (citing Massachusetts v. Upton, 466 U.S. 727, 728 (1984); United States v. Matthews, 753 F.3d 1421, 1326-27 (D.C. Cir. 2014)). This is true because "the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Id. (quoting Gates, 462 U.S. at 236-39). Put another way, the sufficiency of a search warrant affidavit does not require the Court to resolve a "material factual dispute" and, absent such a factual dispute, an evidentiary hearing is not warranted. United States v. Villegas, 388 F.3d 317, 324 (7th Cir. 2004); United States v. Barrera, 843 F.2d 1576, 1581 (10th Cir. 1988) (noting that a "consideration of the probable cause showing must be based solely on the facts and circumstances presented in the affidavit when application for the warrant was made").

To justify an evidentiary hearing, the defendant's attack on the affidavit supporting the warrant "must be more than conclusory." United States v. Becton, 601 F.3d 588, 594 (D.C. Cir.

2010) (quoting <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978)). Moreover, the defendant must tender allegations that "(1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth.'" <u>Becton</u>, 601 F.3d at 594 (quoting <u>United States v. Richardson</u>, 861 F.2d 291, 293 (D.C. Cir. 1988), and citing <u>Franks</u>, 438 U.S. at 155-56); <u>see also United States v. Gaston</u>, 357 F.3d 77, 80 (D.C. Cir. 2004).

DUNCAN's motion does not allege that any of the <u>Franks</u> factors are present in this affidavit – he merely argues that it violates the Fourth Amendment.  Consequently, DUNCAN has failed to justify an evidentiary hearing on this matter and the United States respectfully requests that the motions hearing, currently scheduled for December 19, 2025, be limited to oral argument on the pleadings.

## **CONCLUSION**

The Search Warrants were supported by fresh evidence which established probable cause to believe that evidence of the identified offenses would be found in DUNCAN's residence or vehicle. The affidavit in support of the Search Warrants established a nexus between those offenses and the locations to be searched, and the Search Warrants were not overbroad because the Attachment B limited the agents to seizing evidence that was related to the identified offenses. Finally, even if there was a flaw in the Search Warrants, the agents were entitled to rely on them in good faith.

WHEREFORE, the United States respectfully requests Defendant DUNCAN's Motion to Suppress Evidence Seized on September 18, 2025 (Docket Entry 199) be DENIED without an evidentiary hearing.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:     */s/ James B. Nelson*
        JAMES B. NELSON
        D.C. Bar No. 1613700
        Assistant United States Attorney
        Violent Crime and Narcotics Trafficking Section
        601 D. Street, N.W.
        Washington, D.C. 20530
        (202) 252-6986
        james.nelson@usdoj.gov